Second, Mr. How do you pronounce your name again? Radefeld, Your Honor. Oh, just like it's written. Thank you. You may proceed, sir. And we note that you're appointed under the Criminal Justice Act, and the court wants you to know that we deeply appreciate your willingness to accept the assignment. Absolutely, Your Honor. Thank you. And may it please the court, my name is Matthew Radefeld, and I am the appointed counsel for the appellant, Steven Blakeney, in this matter.  of sentencing and the appeal. Now, there are seven points that Mr. Blakeney would like for me to address in my argument. And for the purpose of saving time, please note that the relief sought in each point is to vacate the sentence, set aside the conviction, and either remand for a new trial or grant Blakeney's request for a directed verdict and or a judgment of acquittal where appropriate. Now the first two points in Mr. Blakeney's brief pertain to the same primary issue of whether or not there was substantial evidence presented by the government to wit a reasonable-minded jury could have found Mr. Blakeney guilty beyond a reasonable doubt of conspiring with another person to deprive another person of their rights and deprivation of rights under color of law. That's counts one and two of the indictment. Although the remedies requested by Mr. Blakeney on these points in his appeal are to be reviewed under an abuse of discretion standard, but when the court is having to review the sufficiency of the evidence in regard to this discretion, the courts are used to use a de novo standard of review of said evidence. And when challenging the existence of a conspiracy, there must be substantial evidence of the conspiracy and not slight evidence or a slight connection. A conspiracy means that there must be an agreement amongst the conspirators, a meeting of the minds as to the object of the conspiracy. And it is apparent from the government's brief that there is no doubt that Sam Samad, the owner of the Pine Lawn Market, did not have a meeting of the minds with Mr. Blakeney and had no idea what the object of Blakeney's actions were, but rather he succumbed to Blakeney's will. However, the government claims that the only well-grounded apprehension, that only well-grounded apprehension of death or serious physical injury would negate Sam's conspiratorial intent. But Blakeney would contend that Sam was just not simply a reluctant co-conspirator, but rather he did what he did because he was faced with a fate that some people say is worse than serious bodily injury, and that is the loss of his liberty and the potential of sitting in a jail cell, possibly with individuals he may have had somehow wronged or had a negative contact with while he was working as owner of the Pine Lawn Market. That was a threatening enough proposition that he made the statements he made, not reluctantly, but out of extreme fear. The next potential co-conspirator put forth by the government is Mario Samad. Let me ask you this. I think the law is fairly clear that if you are coerced into the conspiracy, if you're the one who's coerced, that that's a defense to being a co-conspirator. But is it also a defense to the conspiracy if you were the person who exerts the coercion? In other words, if you force two or three other people to assist you in your unlawful conduct, can you coerce someone into a conspiracy and make them a co-conspirator? And then come back and say, well, there's no conspiracy here because I made them do it? Your Honor, I think that's exactly what the definition of a conspiracy is, that there has to be a meeting of the minds and there has to be an agreement. But Blakeney had a meeting of the minds. He knew what he wanted to do and he knew that he needed these people to assist him. And whether he got them involuntarily or involuntarily, does that make a difference? As far as Blakeney is concerned, it may make a difference as far as the coerced people are concerned. Yes, Your Honor. I mean, if they had a defense as to if they were charged with a conspiracy. Well, Your Honor, I think there are other sufficient charges under the United States Code that would take that into consideration. But you can't deem it a conspiracy if it doesn't have those essential elements and components that need to be met. I think there would be other things, other things that were charged here. But you can't call it a conspiracy if you don't have other co-conspirators who are meeting those exact elements in order to take part in the conspiracy. Did the district court give an instruction beyond the sort of general conspiracy instruction that sort of highlighted this issue or was it argued or how was this issue presented to the jury? Your Honor, I believe in closing argument, it was addressed by defense counsel. But I do not believe looking at those instructions, I cannot recall at this point in time that it was a very voluminous case file. I do not recall a specific instruction wherein a conspiracy was defined any further than just the general conspiracy instruction. But moving on to the next potential co-conspirators, Your Honor, put forth by the government. Wait a minute, let's go back to Sam. He was instructed to lie about what happened with the poster by your client, right? Yes, allegedly, yes, Your Honor. And he said that he was going to lock Ford up, right? So why isn't that enough that he would have known what the object of the conspiracy was? Well, Your Honor, we have other arguments to kind of go as to what Blakeney's alleged intent were in regard to, you know, dealing with, you know, locking her up for a questioning versus locking her up for a warrant and, you know, the different levels that that would constitute. So I believe the testimony of Sam stated that he had knowledge that Blakeney was going to use what occurred in that pylon market to have her locked up. But there are also varying different layers of individuals who had reviewed certain evidence of certain things that took place at that pylon market that would have also been involved in the making of that decision. So, I mean, when you're being, I mean, I guess when you're being questioned by a police officer, I guess the overreaching possibility is that someone may eventually get arrested. And I don't know if that's what Sam was specifically testifying to or not, Your Honor. Well, the issue is, must the co-conspirator share the real conspirator's criminal intent? I believe, Your Honor, that would go into the recentral element of... That is what? I mean, what's your strongest court case that supports your view of the case? I apologize, Your Honor. I believe we cited it in our brief as to what that would be. We'll look for it. We'll see if we can find it. Okay, Your Honor. Thank you. Moving on to the next potential co-conspirator that was presented by the government was Mario Samad. And he was a worker at the Pine Lawn Market and a relative of Sam Samad. And he also does not fall under the co-conspirator possibility because he was actually interviewed by Officer Brock at the Pine Lawn Market and not Blakeney. And that was prior to them going down to the police station to be interviewed further. However, there was conflicting testimony at... Well, he could have been a co-conspirator if Blakeney told him what to say to Brock. And if he was not a reluctant individual as well, Your Honor, I think there's kind of two arguments that can be made in regard to Mario because Mario was initially interviewed by Officer Brock, wherein he told Officer Brock what occurred at the Pine Lawn Market. And when he went down to the police station, from my understanding, he wrote a written statement that just simply reiterated the statement that he gave earlier to Officer Brock. And it was not given to him by Officer Blakeney. However, during the course of trial testimony, Mario Samad stated that he was never interviewed by Officer Brock. However, when Officer Brock testified at trial, he in fact stated that he did talk to Mario Samad at the Pine Lawn Market. And that contradiction is important because it cuts directly into whether or not Mario told Officer Brock what he actually saw, which means... versus what he claims Blakeney made him say, which if that's the situation, then I believe Mario would stand in the same shoes as Sam and simply put that he would not be considered an actual co-conspirator. Lastly, the government in their closing argument insinuated that former Pine Lawn Mayor Sylvester Caldwell was a co-conspirator with Blakeney in this case. However, this was brought forth for the first time by the government in closing and that there was no evidence presented of this conspiracy during the trial. And the government affirmatively notified the court when asked specifically that the only co-conspirators in this case were the store owners and managers, which Blakeney contends they were not. Without these co-conspirators, then Count 1 should have been directed out as requested by Mr. Blakeney. Blakeney's second point on appeal pertains to Count 2 of the indictment wherein Blakeney allegedly caused a warrant to be issued for Ford's arrest based on false allegations and without probable cause. In truth, Officer Brock had only entered a wanted for questioning for disorderly conduct and stealing under $500. And no warrant was ever issued for Ford's arrest as a probable cause statement would have been required, which then would have been signed by a judge. The fact of the matter is that there is a huge difference between a wanted and a warrant. But Officer Brock's independent development of probable cause for a wanted and Pine Lawn Prosecuting Attorneys Anthony Gray's authorization of charges against Ford purge or attenuate the taint of any alleged wrongdoing committed by Blakeney. Officer Brock interviewed Witness Mario and April Brooks at the Pine Lawn Market, not Blakeney. Their statements corroborated what was on the surveillance video from inside the store, which was viewed by Prosecutor Gray, who authorized the arrest for a wanted of Ford prior to any alleged false report being made. There was no evidence ever presented that Blakeney told Brooks to lie. Then when the police and Prosecutor Gray went to Ford's house to question her, what did she do? She lied to them about taking the sign down, which was clearly contradicted by the video they viewed. This lie provided sufficient enough probable cause to at least arrest her on a 24-hour hold on a wanted and take her back to the police station to be questioned at some point. This happens every day in St. Louis exactly in this manner. They had probable cause to question her sometime within that 24 hours. And then a prosecuting attorney, not Stephen Blakeney, makes a decision as to whether or not charges should be issued against her. And lo and behold, Ms. Ford did have charges issued against her for her actions that day in the Pine Lawn Market. But she didn't take it to trial and profess her innocence. Rather, she hired an attorney who got one of the charges dismissed, and then the other one was amended and she paid a fine. So to be perfectly clear, the rights Ms. Ford was allegedly deprived of, she was actually charged by someone other than Blakeney with those offenses and ultimately pleaded guilty to an amended charge. Stephen Blakeney was convicted on count two for the six hours that Ms. Ford sat in a jail on the wanted for questioning for charges that she was ultimately charged with and then plea bargained away. For these reasons, Blakeney's motion for a directed verdict on count two should have been granted. Blakeney's third point on appeal is made in conjunction with his pro se motion to this court to supplement the record on appeal to allow for the submission of former Pine Lawn Chief of Police Ricky Collins' affidavit, which states that a police report in Pine Lawn was not a final approved report without both the reporting officers and the approving officer signatures. The reasoning for this request is that Blakeney allegedly falsified the Pine Lawn police report, giving rise to the charges in count three of the indictment. However, the document submitted to the jury at trial was an unsigned and unoriginal copy of the arrest report of Ford. The issue with an unsigned copy of the police report is that it is not the final approved copy. Now, trial counsel failed to object during trial, so Blakeney is asking this court to Blakeney's substantial rights and seriously affected the fairness of the judicial proceedings surrounding count three. In order to get over the hurdle of affecting substantial rights, wouldn't you have to come forward with some kind of evidence at this point to show that what the unsigned copy is different than the signed, filed copy? Because if the unsigned is exactly the same as the signed, then it's kind of no harm, no foul. It seems to me you have a real tough time getting over it. Your Honor, I believe... Plain error. And from my client, I can tell you my understanding of that is that I have never seen, have never been given a copy of a final signed report. That is the issue. So we can't show you that there's a difference between the final signed copy and the copy that was introduced at trial, because to my knowledge from my client, there is no final signed copy. And it would have been an unsigned copy that went to the prosecutor, right? To my understanding, that is correct, Your Honor. So why would it make any difference in the case, then? Because Your Honor, if it was an unsigned copy that went to the prosecutor, then Mr. Blakeney's defense of I never falsified that document because it wasn't a final approved copy that I signed. He was the approving officer. He was not the writing officer. Yeah, but he also provided all the information, or at least a lot of the information for it. That's what the allegation is, Your Honor. But the charge itself is the falsification of record. So if the evidence of that falsification of the document, of the record, is that police report. Causing it to be falsified is the same thing, is it not? Causing it to be falsified versus an actual document? I mean, he knows the police report's going to be prepared. He assigned somebody to prepare it. He provides the false information that prepares and it goes to the prosecutor.  It is the final approved copy, which didn't occur. So you can't have a falsification of a document if he didn't sign the final document. The case that says that? No, Your Honor. But actually, the government, the only case that they have the ability to rely, that they've relied on was a Fifth Circuit case, United States versus Yasmeen, that states that relevant evidence omitted without objection may properly support a verdict so far it has probative value. Even though its exclusion would have been required on appropriate objection. So Your Honor, if you're talking about, I bring forth that case because I don't think there is any case law out there that says that anything about a final approved copy of a police report isn't until both officers, the approving officer and the writing officer, sign it. That case doesn't exist. However, that's why Mr. Blakeney has submitted the affidavit of former police chief Ricky Collins to show that that is what is deemed to be a final copy of a report is when the approving officer and the writing officer sign it. What was the testimony that was used to lay the foundation for the admission of the document? I believe that was with Officer Brock, Your Honor. Did he say this is the report that was filed? He said that that was the report that he filed, not necessarily the report that was approved by Blakeney. Officer Brock testified that in the normal course of Pine Lawn procedure, it was typical for Mr. Blakeney to approve his reports. But there was no evidence brought forth that that document was actually signed by Blakeney other than that testimony of Brock, which I just stated. But that case that's brought up, United States v. Yasmeen, by the government, that's exactly what plain air review is meant for. If the evidence exclusion would have been required upon a proper objection, then how can reversal not be granted? The best evidence here would have been the final approved police report signed by Blakeney as a supervisor. But there was none. And without that, the government cannot prove beyond a reasonable doubt that Blakeney falsified any police report. We would ask you that you allow Blakeney to supplement the appeal record with the for-reference affidavit. Without this improper police report evidence, there is no grounds for the charge in Count 3. On Blakeney's fourth point on appeal, he argues that the district court committed plain air in allowing Sam Samad to testify as to hearsay statements regarding former Mayor Caldwell without first establishing that there was any conspiracy between Caldwell and Blakeney. Trial counsel again failed to object during trial, but allowing these statements have affected Blakeney's substantial right to a fair trial and seriously affected the fairness and integrity of the trial. Blakeney argues that this fairness aspect, or lack thereof, is very prevalent in this point because the government specifically told defense counsel and the court during trial that the alleged conspiracy in this case was between Blakeney and the store owners and managers. However, even with this affirmation, the government still elicited statements from their witness, Sam, that contained hearsay statements from Caldwell. And this came after the government, prior to trial, sought to limit the amount of evidence defense counsel could get into regarding Caldwell, to what the district court agreed. Yet, the government brought in Sam to testify in this manner regarding Caldwell and then named Caldwell a co-conspirator in closing argument after Blakeney was no longer able to respond in front of the jury. No conspiracy was ever established with Caldwell prior to the admission of these hearsay statements and thus are admissible. Your honors, in count five of the appeal, this court would review de novo whether the And then the court would review Blakeney's request for a new trial for an abuse of discretion. Now, even indirect references to a defendant's failure to testify are prohibited if it's the prosecutor's intention to highlight defendant's failure to testify or that the jury would have naturally understood them to be a comment on the defendant's failure to testify. The government, in their closing arguments, brought forth that the defense counsel failed to bring forth evidence that was listed in his opening statement and the government probably should have stopped there. However, they continued to comment on the fact that this evidence was not contradicted by anybody and only Blakeney alone would have been the individual who would have contradicted that testimony, which thus is a comment on his failure to testify. The court's instructions on how to treat counsel's closing arguments did not alleviate the prejudicial effect because it's the government's argument that Blakeney asserts as error and not the defendant is not simply evidence. So next, this court must then examine whether that comment, without this comment, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty, which through the analysis set forth in our briefs, and I'm running out of time, it would show that it was not harmless and this was a violation against Blakeney's Fifth Amendment rights. And shortly, Your Honor, and points six and seven have to deal with questions that were posed by the jury during their deliberations, which we feel were not properly addressed by the district court. They should have been properly answered. Mr. Blakeney was not in the courtroom when the jurors asked the question whether or not there were any trial transcripts that they could have. Several of the witnesses spoke English as a second language and we don't know whether or not the jury had any problems understanding or had possibly misheard what they said. And Mr. Blakeney had a constitutional right to be there to object to the court's instructions. Thank you. Mr. Harris, good morning. You may proceed. Thank you, Your Honor. I may have pleased the court. My name is Reginald Harris. I represent the government in this matter. In this case, the government proved by competent evidence and beyond a reasonable doubt at the time. The defendant abused his power as a police officer by engaging in a conspiracy to falsely arrest Nakesha Ford, who was the opponent of the then mayor at the time, and then causing the falsification of a police report regarding that arrest. On behalf of the government, I'm asking this court to uphold the jury's verdicts and to affirm the conviction on each of the three counts of the indictment because the government a reasonable doubt, and because all of the district court's rulings and the responses about which the defendant now complains were proper. Starting off with the first point of error that the defense raised is here on appeal. The government produced more than sufficient evidence to prove a conspiracy in this case. It's important to start with a standard by which this court evaluates the evidence. The court is to view the evidence in the light most favorable to the verdict, resolving all conflicts and accepting all inferences that support that verdict. Here, the government had to prove the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy. The dispute here on appeal is asked to that first element, whether or not the government in fact proved a conspiracy. The defendant suggests that there was no meeting of the minds. I don't think that the meeting of the minds language is very helpful here. We know that there was no requirement, the law is that there's no requirement on the part of the government to prove a formal agreement, a written agreement, or some express, laid out agreement between the parties to plan to have Ms. Ford falsely arrested. The question is whether a reasonable jury could conclude from the facts in the case, from the circumstances and the inferences that can be drawn there from, that such conspiracy was in fact proved. I think if we go through some of the evidence in the case that was put before the jury, we'd reach the conclusion that a reasonable jury could and did in fact find that the conspiracy was proved. Let me ask, before you get into the... Is defense counsel correct that you had never named the mayor as a co-conspirator until final argument? No. First off, the indictment itself, while it doesn't suggest the mayor's name in particular, the indictment says a conspiracy between the defendant and Akram Samad and others known and unknown to the grand jury. And I would note that even before we began picking a jury in the trial, the trial counsel for the defendant at the time stated, and this is found in volume one of the transcript, pages nine and 10, defense counsel stated, quote, because Mr. Blakeney is charged with a conspiracy to have Nekesha Ford prosecuted on this particular matter, it's my understanding that potentially one of the conspirators would in fact be Mayor Caldwell. So I do anticipate, at least in our handling of the information, that we would be referring to him in his capacity as mayor and the things that he did that maybe were erroneous or improper. I anticipate that our evidence will show that the mayor was driving this as opposed to our client, Mr. Blakeney. So even before we started picking a jury in the case, I mean, it's clear that the defense attorney at trial knew that the mayor was a potential conspirator in the case. The discovery that was turned over also includes the statements that are, some of the statements that are at issue in, I believe it's point four here on appeal, that go to Mayor Caldwell's involvement in the conspiracy. So there was no ambush. There was no surprise in this case with Mayor Caldwell being a potential co-conspirator. The evidence, as was alluded to earlier, let me just start with Akram or Sam Samad, who was the store manager. Sam testified that the defendant is the one who made him call 911 and make the false report. Sam testified that he did, in fact, do that. And the report was false in the sense that he had given permission for her to take it or not? It was false in the sense that that she had stolen, that she had stolen the sign, that Sam Samad had himself originally obtained the sign from from City Hall, when in fact the sign was brought to the store by the defendant and placed in the store. So it was false in both of those regards. And he and so why would the source of the sign matter where it came from? Why would that matter? Well, I mean, that's just one of that's just one of the things that was false about the report. And in fact, Sam, that doesn't have anything to do with whether the poster was taken improperly. Well, but that's the basis of the arrest, isn't it? That's correct. Although Sam Samad also testified that one of the things that Mr. Blakeney and Mr. Caldwell told him to say was that he got the sign from City Hall himself. And so I think that that sort of it colors or it helps us understand the totality of the conduct in this case. But the key is he was told to lie about whether he gave her permission to take it. Right, he was he was told to lie about whether or not she stole the sign. And in fact, the sign was not stolen. OK, that's what I'm getting at. I mean, right. She there's no question she took it. There's no question she took the sign. So the question is, did she have permission or not? Right. And so the owner of the store who who first encountered Mr. Blakeney, when that's another who's the owner of the poster, is it the store owner or is it the campaign or? Well, I don't know that that that was that really came up in the trial or was an issue at trial, but the so the store owner, when Mr. Blakeney came to the store and saw that the sign was no longer up, the store owner, Mario Samad, he testified that he told Mr. Blakeney that she had permission to take the sign down and that she did not, in fact, steal the sign. Also, the video surveillance of Ms. Ford coming to the store shows her calmly taking the sign down, not ripping it down and running off, but taking the sign down, speaking with the owner for a few moments and another person who was there and then calmly leaving the scene. So those are some of the some of the things that that show. Well, and let me let me just go a little further. Both Sam Samad and Mario Samad testified that when they went to the police station to give their statements to the police prior to going into the interview room for the recorded interview, they met with the defendant in the hallway, each of them separately, at which time the defendant told them what they needed to say in the interview room. And they each testify that what he told them to say was untrue. But they were lies. Well, you alluded to the fact earlier that. The two store, the store owner and store manager testified that Blakeney made them do this, that he coerced them into doing it. If we accept that as true. Can you have an agreement when the server is asking defense counsel if the person, in this case, Blakeney, make somebody do something? Is that is is isn't it part of the implicit in the understanding of an agreement that it's something voluntary, that the people went into the agreement on a voluntary basis, that you can't have a conspiracy if you make somebody do something? Well, and I addressed that in the brief. I think that the case law out there is that that the only way that this idea of coercion or duress can overcome conspiratorial intent or the intent to commit a crime would be that if if the coercion or the course of conduct rises to the level of a well-grounded apprehension of death or serious bodily injury. I mean, in this case, there was clearly no apprehension of death or serious bodily injury. Well, but I think that goes to the I think that goes more to the if you had charged Sam with with if you had charged Sam Surratt with conspiracy, then he could raise that coercion defense. But I'm asking about the underlying requirement that there be an agree a criminal agreement. And can you have an agreement when when the person with whom you're conspiring, you you forced to do it? I think that you can. I mean, I think and I think in this case that Mr. Samad was a reluctant co-conspirator. I think he had opportunities to say, no, I'm not doing this. I mean, he was around officers for much of the time that this happened, either at the police, either at the store or at the police station. And even when officers came to investigate this matter, the prosecutor came as well. So he had opportunities to tell police. He had opportunities to tell the prosecutor, look, this is not right. You know, he's making me do this. You know, I don't want to do it. But he didn't do that. Instead, he went he went along and and did what Mr. Blakely directed him to do. And I think that those things show that he was part of the conspiracy. And I would also suggest that I think that it would be I think it would be absurd indeed if the result was that the defendant could could, you know, strong arm or force someone to do his bidding and then say, well, you can't convict me of conspiracy because I forced them to do it. I just don't think that that's the kind of result that that we ought to be left with. Well, but I think defense counsel's counter to that was, yeah, but you have a whole. Our system was book book this thick of other statutes you could have charged them with. You don't have to charge him with conspiracy. You could charge him with a substantive offense. You could charge him with coercion. I mean, just because you don't get the one charge doesn't mean he gets to walk away. Well, I mean, I understand that. But again, I think that in this case, again, Mr. Samad had, as I said, opportunities to not participate in this in this offense. And there's no suggestion that Mario Samad was in any way strong armed or threatened with, you know, having a case put on him, as they say, or going to to jail. Mario Samad testified that he went to the police station as well and that he spoke with the defendant prior to going into the interview room and that he also agreed to lie in his statement to the police. So those are other indications that are that's other evidence showing that there was a that there was a conspiracy, in fact, in this case between Mr. Blakely and Mr. and Mr. Samad, Sam Samad and Mario Samad. And then finally, I'm sorry, at the very least, it was a tacit. Conspiracy. Yes. And I suppose back to to counter the argument that Defense Council make, you could say, well, a defendant doesn't get to pick and choose the charges that the government is going to file. I would agree with that, Your Honor. I think that's not a legal significance. I think that's correct. I would also point out that the evidence also shows that Mr. Caldwell was a part of this conspiracy. He had motive. He he there's testimony that he was even there in one of the meetings prior to one of the Samad's going into the interview room to provide their statement to the police. I think that those that those comments as to the sufficiency of the evidence of conspiracy, I think that they also that that those that the evidence also shows that there was more than sufficient evidence for a reasonable jury to find beyond a reasonable doubt that the defendant was guilty of count two, which was the deprivation of the rights of Nikesha Ford. This idea that there was independent probable cause to arrest Miss Ford, I think this is the mark. The suggestion that the statement that that Mario Samad, the owner and the statement that Miss Brooks, one of the employees, gave to Officer Brock provided independent probable cause for the arrest is just not that's just not correct, because there is no there really is no evidence of what those statements were. And we can't rely on the police report, I don't believe to as evidence of what these individuals told Officer Brock when they were when when he interviewed them, because that police report is exactly what the jury found was falsified in this case. And I don't think we should be looking to that report to find out what the statements were that these two individuals made to Officer Brock. And at best, it's unclear what Mario Samad and what April Brooks said to Officer Brock when he came to the store to investigate. But despite all of that, aside from all of that, we know what's not unclear is that the defendant is the one who knew the truth because he said it all in motion. And that's what the jury determined after listening to the evidence and assessing the credibility of the witnesses. He knew what the truth was. As to the third, when I read the briefs, I said, you couldn't make up the facts of this case. I agree with that. I agree with that. It was such an earthshaking crime that they had to arrest this woman on Easter Sunday night at home while she was there with her 12 year old daughter. I suppose the very foundations of the Republic of Pine Lawn would have shuddered had they not done that. I had I had a similar sort of thing go on off in Pine Lawn. I don't know. I I'm afraid that maybe that's a local culture. I'm afraid that, you know, it's possible that that happened from time to time. But but I don't know that for a fact, Your Honor. I haven't read the trial transcript, I have to admit or confess. What was the overlying theory of the government's theories that this was merely retaliatory action against Miss Ford from day one? I'm sorry, what was the underlying? Well, it's irrelevant. Go on. OK, I'm sorry. Well, as to trouble making myself clear, and I certainly haven't done very well this morning as to the third point on appeal, the admission or the admissibility of the exhibit 16, which was the police report in this case. The argument by the defense is that it that that exhibit should not have been admitted because it violates the best evidence rule. And of course, as they point out, there was no objection in the trial court. And so this issue should be analyzed under plain error analysis. Now, the best evidence rule is codified in the federal rules of evidence one thousand two. That rule does not require the document to have a signature. It only requires that an original be used unless the rules provide otherwise. And the rules do provide otherwise. It's the very next rule, rule one thousand three, which allows duplicates to be to be used in evidence unless there's a genuine question that's raised about the authenticity of the original or unless the circumstances make it unfair to admit the duplicate. Neither of those two circumstances were brought forth in this case. There was no question raised in the trial court as to the genuineness of the police report. And there was nothing unfair about admitting the exhibit in trial. The defendant is asking this court to accept and consider the affidavit filed by one Ricky Collins, who purports to be the one time chief of police in Pine Lawn. But Ricky Collins was available to testify at trial and they could have called him then, which would have given the government an opportunity to test what it is he's trying to say in this affidavit and would have given the jury the chance to assess his credibility. But none of that happened. I don't think they can, after the fact, try and put evidence in front of this court, which was never brought forth at the trial level. I want to move with the amount of time I have left to the closing argument that was made in the case, which is complained of here. The comments about which the defendant complains that were made in closing argument in no way addressed his failure to testify. The comments at issue are set out on page 37 of the government's brief. And these were comments on the failure of evidence supporting the defense theory in the case, not on the defendant's failure to testify. The defendant introduced a theory in its opening statement that it was Anthony Gray, who was the Pine Lawn prosecutor at the time, who made the decision to arrest in this case, and that the defendant disagreed with that decision and that the defendant suggested that they should issue a summons as opposed to going to her residence to arrest her. And they pressed this theory when they cross-examined two of the government's witnesses, which were officers Brock and Lawson. Now, the government countered that theory by eliciting testimony that the defendant never suggested that a summons should be issued as opposed to going to arrest Ms. Ford. And so where the government was heading in its closing argument was pointing out the failure of evidence to support that defense theory. And I think back, if you look at the standard of review, which is an abuse of discretion here, you have to find that the court abused its discretion in overruling the government's, in overruling the defendant's objection to closing argument. It's just not there. The court did not abuse its discretion because, as I stated, those comments that were made in the government's closing argument went to a failure of the evidence to support the defense theory. Again, I would ask this court to uphold the verdicts in this case that were given by this jury and to affirm the convictions. Thank you. Very well. Thank you. I believe defense counsel used all his time. Very well. The case is submitted and we will take it under consideration.